UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA – TAMPA DIVISION


GRASSFIRE, LLC,

                    Plaintiff

v.                                                        No. 8:21-cv-2719-WFJ-JSS

STEVEN LARRY LAWS, SUSAN MAYS,
AMBER MURRAY, DEVON WARD,
FARELLE WALKER, MICHELE LAWS,
BRIAN LENHART, ASK AMBER, LLC,
FLY RENEGADE PRODUCTIONS, LLC,
TBO POLITICAL PARTNERS, L & R
LOGICAL SOLUTIONS, LLC, and
RENEE GORDON,

                    Defendants
_____/


COURT'S MEMORANDUM ORDER

This order summarizes the Court's *ore tenus* ruling of December 21, 2022 denying plaintiff's motion for preliminary injunction and dissolving the temporary restraining order ("TRO").   Plaintiff filed this complaint seeking damages and restraining orders on November 19, 2021.  The Court entered a TRO on November 22, and set a hearing for November 29, 2021 on both the TRO and plaintiff's motion for preliminary injunction.  The parties moved to continue that hearing, and to permit expedited discovery, which the Court granted.

The Court held an evidentiary hearing on the motion for preliminary injunction and review of the TRO, on December 21 and 22, 2021. The plaintiff was given leeway to introduce all evidence it desired. The plaintiff called each individual defendant as a witness, as well as several others including a principal of plaintiff. The Court admitted many paper exhibits from both parties. Although plaintiff's case was well-lawyered, the Court concluded at the end of the plaintiff's case that the entitlement to preliminary injunction had not been proven. The Court then dissolved the TRO.

*BACKGROUND OF THE CASE:* Plaintiff is working under contract to support a petition drive to place a casino gambling petition on the Florida statewide ballot. This petition drive was in opposition to the Seminole gaming compact and those interests. The defendants and their entities were working for plaintiff to help gather those petition signatures. The individual defendants, with one exception, have familial relations. They are coordinators who facilitate the recruitment and management of solicitors (or circulators) who obtain petition signatures from Florida citizens. Typically these solicitors work at parks, festivals, gas stations, etc. and periodically they turn in signatures to the coordinators for transmission to plaintiff.

The defendants left the employ of plaintiff around October 18, 2921, and began circulating a "plebiscite" petition for the Seminole compact interests (*see* plebiscite

1

petition at Doc. 70-8).  Unlike plaintiff's petition, this plebiscite did not seek to get anything on the ballot.  Nor did it denigrate or seek expressly to defeat plaintiff's petition.  The plebiscite petition simply expressed support for the Seminole gaming compact.  The plebiscite petition drive seems to be an expression of support for the Seminole gaming compact and also a strategy to distract or occupy petition gatherers like plaintiff who might impair Seminole gaming interests.

The plaintiff did not have non-compete agreements with the coordinator defendants, nor any written confidentiality, non-solicitation agreements.  The contracts that did exist between the plaintiff and some of the defendant LLCs can be seen in plaintiff's exhibits 21, 22, 23.  All remain unsigned by plaintiff.  These are at will contracts, not non-competition agreements.  Although they mention protection of plaintiff's business knowledge and trade secrets, they do not stop the defendants from leaving work for plaintiff to work for the competition.

There was nothing in writing (or orally as a matter of restriction) with any individual defendants or the main leader of the coordinators, Mr. Laws.

Likewise, the contracts that plaintiff claims to have with some of the solicitors were "at will" and appeared to bind the solicitors only to a 7-day period of noncompetition if they went elsewhere.  No signed agreements with the solicitors were offered into evidence but a blank one was offered at plaintiff's exhibits 83, 84.

2

The lack of noncompetition agreements or restrictive covenants appears typical in this industry.  Workers apparently come and go without binding non-competes or solicitation bars.

The petition solicitors or circulators must be registered with the Secretary of State, and their identities are matter of public record.  It is against the law in Florida to pay a solicitor for a ballot initiative on a per-signature-obtained basis. Fla. Stats. 104.186.   Plaintiff has had some 5000 solicitors working for it on this present campaign, and apparently had about 2000 when the defendants hired on as coordinators.  Plaintiff's principal testified that only about150- 200 of the solicitors are active and effective daily, and when defendants left plaintiff lost about 70 of those.  Apparently other companies besides plaintiff are working on this petition drive.

Concerning trade secrets, the plaintiff alleged that gas station locations (*see* plaintiff's exhibit 3-5) that it had under contract were proprietary. The credible evidence was that gas station locations were not effective spots for the solicitors, and were not used frequently.  Plaintiff's principal stated he had no evidence the gas station locations were handled improperly or part of defendants' alleged misconduct.

Likewise Plaintiff asserted that the identity of the solicitors was a trade secret as was the "validation reports" (*see, e.g.,* plaintiff's exhibits 69-70) showing who was

effective.  The credible evidence is that most of the solicitors relevant here were connected to or brought to this campaign by the defendants, and were not brought to the business or recruited by plaintiff.  Nor was there any indication that it was a secret or difficult to discern who was good and effective – thus the validation reports were not a particular advantage to have.  Nor did validation reports have anything to do with the Seminole plebiscite petition – registered voters were not needed for that petition, only Florida residents.

It is vital for a party asserting trade secret protection to take prior steps to ensure security of same.  Here there was no indication of this prior security.  For example, the "validation reports" were not marked "confidential" or "trade secret."

Plaintiff's office locations across the state where solicitors were to turn in their signed petitions were also alleged to be a trade secret.  But there was no proof that defendants were doing anything untoward with this knowledge.

Concerning defamation, there was some disputed proof about defamation of plaintiff concurrent with the departure of defendants.  Some of this may have been due to the apparent refusal of plaintiff to pay earned bonuses to departing solicitors.   There was no competent or direct proof that any defamation continued, was continuing, or involved solicitors beyond those working under the defendants. Nor was any causative damage shown from this disputed evidence.

4

There was no proof that defendants converted or asported any property of plaintiff upon their departure.  Efforts were made to send back or provide to plaintiff what belonged to plaintiff.

 Mr. Laws apparently kept plaintiff's principal informed that he was being wooed by the "other side" to come work for them.   This included conversation with plaintiff and providing plaintiff's principal at least one of the draft contracts offered by the Seminole-allied contractor.   It appears plaintiff just got outbid for defendants' services.

Plaintiff offered no credible proof of active "sabotage" of plaintiff's efforts by these defendants.  To the extent that defendant Laws' shut off one internet account impairing plaintiff, that shut-off lasted only 3-4 days  That shut off would have been resolved in a day had plaintiff's principal been able to attend to it immediately upon discovery rather than remain in Oregon for a household move. That alleged misconduct was flatly disputed by Mr. Laws.  Mr. Laws testified that the internet account was listed in his name, and it was in arrears and other internet accounts of plaintiff remained operable in the building.    If misconduct this be, it was a past act that might support retrospective damages.

There was no evidence that the defendants failed to turn in all appropriate signatures belonging to plaintiff before their departure from plaintiff's employ.   It is noteworthy that signatures for plaintiff's campaign must be certified by the

county election officials no later than January 31, 2022.  Plaintiff's principal

testified that the signature campaign is unofficially over on December 31, 2021.

Although plaintiff will keep collecting and submitting after this date, any

signatures turned in after 2021 run the ever-growing risk of not making the county

certification deadline.  Thus the benefit of a preliminary injunction to plaintiff

(coming just prior to the campaign's unofficial closure) is less given the calendar.

  *Conclusion of Law:*    Plaintiff is required to prove 1) a substantial likelihood of

success on the merits, 2) irreparable injury, 3) that the present harm plaintiff

suffers is outweighed by harm to the defendants by the injunction, and 4) the

injunction is in the public interest.  *Zardui-Quintana v. Richard,* 768 F.2d 1213,

1216 (11th Cir. 1985).   This is an extraordinary remedy.  The Eleventh Circuit

describes it as "drastic."  *Id.*

  There being no controlling non-competition agreements, it was incumbent upon

plaintiff to establish usurpation of protectible trade secrets, or actionable, ongoing

inequitable conduct.  Those were not clearly proven.

  The trade secret usurpation was illusory.  A trade secret is information that 1)

derives economic value from  not being readily ascertainable by others and 2) is

the subject of reasonable efforts to maintain its secrecy.  *See* Fla. Stats. 688.002(4);

*American Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th

Cir. 1998).  Those two elements are missing here.  "Information that is generally

6

known or readily accessible to third parties cannot qualify for trade secret protection." *Id.*

Boiled down, this case lacks the proof of irreparable harm: no appreciable trade secret theft, no enjoinable, concrete ongoing sabotage by defendants. Most importantly, a key element of irreparable harm is that it addresses injury that money damages cannot recompense. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Northern Fla. Chapter of Assoc. Gen. Contractors v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir. 1990). Plaintiff's principal was able to estimate the monetary loss to date when he testified, and this "weighs heavily against a claim of irreparable harm." *Id.* "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Id.* Plaintiff has not "clearly carried," *id.,* its burden.

For the foregoing reasons, the Court denied the motion for preliminary injunction and dissolved the TRO.

DONE AND ORDERED, this 28th day of December, 2021.

/s/ William F. Jung
William F. Jung
United States District Judge